Filed 1/14/14  P. v. Alvarezmendoza CA6

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>JUAN CARLOS ALVAREZMENDOZA,<br><br>    Defendant and Appellant. | H039159<br>(Santa Clara County<br>Super. Ct. No. C1122238) |

Following a jury trial, defendant was found guilty of continuous sexual abuse of a child under the age of 14 years (Pen. Code, § 288.5 subd. (a))[1] (count one) and two counts of committing a lewd and lascivious act upon a child of 14 or 15 years by a person who is at least 10 years older than the child (§ 288, subd. (c)(1)) (counts four [14 years old] and five [15 years old]).[2]  The victim of the offenses was his niece, V.  The trial court sentenced defendant to a total prison term of 13 years and four months.

On appeal, defendant maintains that the trial court erred by (1) admitting testimony regarding Child Sexual Abuse Accommodation Syndrome (CSAAS) and

---

[1]     All further references are to the Penal Code unless otherwise specified.

[2]     Counts two and three alleged that defendant committed lewd and lascivious acts upon a child under the age of 14 years.  The jury was instructed that count one was an alternative charge to counts two and three and, if it found the defendant guilty of count one, it was required to find defendant not guilty of counts two and three.

1

giving the standard jury instruction regarding use of CSAAS evidence (CALCRIM No. 1193) and (2) giving a motive instruction (CALCRIM No. 370). We find no errors and affirm.

I

*Evidence*

The evidence viewed in a light most favorable to the verdicts shows the following.[3]

V. was born in June 1995. Her immediate family consisted of her mother, her father, a brother, and a sister. V.'s paternal aunt E. was married to defendant, who was born on December 31, 1970. Defendant and his wife had three children, V.'s cousin B., who was about a year older than V., and her younger cousins D. and C. The two families were close and saw each other at least once a week. V. often spent the night at her aunt's and uncle's apartment.

In 2003 to 2005, when V. was between the ages of eight and 10 years, defendant and his family lived in a Sunnyvale apartment. An incident occurred during that period when V. was spending the night at her cousins' home. V., V.'s sister, and her cousin D. were watching a movie in the living room. They were sitting on the floor with their backs against the couch. Her aunt E. was in the room. Defendant was sitting on the couch. At some point, her aunt went to her room. V.'s sister and cousin fell asleep.

Defendant began playing with V.'s hair. After playing with V.'s hair for about five minutes, defendant touched her right shoulder. Defendant's hand began "slowly going down" her right arm. Defendant's hand moved near her thigh and then under her pajamas. Even though she had said nothing, defendant said, "Shh." She was in shock. He touched V.'s vaginal area with his hand over her panties and he rubbed the area for

---

[3] Defendant testified on his own behalf and called other family members as witnesses.

2

five minutes. Defendant then moved his hand under her panties and started rubbing her vaginal area. Then his fingers went "a little bit" inside her vagina. V. "jumped a little" and she was scared. She did not know what to do and felt "lost." She got up "real quick" and went to the bathroom; she looked in the mirror and started crying.

After staying in the bathroom for 10 to 15 minutes, V. went back to the living room to wake up her cousin and her sister. Defendant, her uncle, was gone. V. woke them up but she did not tell them what had happened because "[t]hey were too little," she was scared, and she did not "want them to know something horrible just happened." She told them they had to stay awake and see who could stay awake the longest. The three of them stayed awake all night. When V.'s parents came for her the next morning, V. did not tell either parent what had happened because she was scared. She did not know if they would believe her or if "they would disown [her] as their daughter . . . ." She thought that other people might think it was her fault.

When V. had to return to defendant's apartment, she felt awkward, weird, and scared. V. did not tell her parents that she did not want to go back there. She made herself believe that it was "just one thing."

Another incident occurred when V. was between eight and 10 years old. She was lying on her stomach on the bed watching TV in her cousin's room. The other children, V.'s sister and cousins, were playing outside. Defendant came into the room, sat down next to her, and was talking to her. He grabbed V.'s wrist and placed her hand on his erect penis over his shorts for a couple of seconds. She pulled her hand away and got up and went outside. She did not say anything to her sister or cousins. When V. next saw her parents, she did not tell them what had happened because she was afraid to tell them. Her parents were strict and V. was afraid of what they and other people would think of her and "what they would do."

3

When V. was 11 years old, she went into her cousin B.'s room where he was playing video games. V. was sitting on the floor with a blanket over her lap. Defendant came in and asked to use the blanket too and put it over his lap. As defendant was watching the video game, defendant's hand went to V.'s thigh and then he unzipped her jeans. He started rubbing her vaginal area, first over and then under her panties, and he then penetrated her vagina. After that touching had gone on for three minutes, V. got up and walked away quickly. She went to the bathroom. She did not go tell her aunt what happened or say something to her cousin B.

In 2006 to 2007, when V. was between the ages of 11 to 12 years, defendant continued to touch V.'s vaginal area. V. estimated that, from the age of eight to 12 years, defendant touched her approximately 10 to 13 times.

On one occasion when she was 10 or 11 years old, V. faked being sick to escape defendant. Defendant and V. were sitting on the sofa with a blanket. He began rubbing over her panties and then his hand went underneath. Her cousin D. and her sister were in front of the couch. After about three to five minutes, V. went into the bathroom; she decided that she would act sick. V. went into her aunt's room, where her aunt was watching TV, and V. said she did not "feel good" and she felt like she was going to throw up. V.'s aunt said that V. could sleep with her and she would tell defendant to sleep elsewhere. V. did not tell her aunt that defendant was touching her.

When V. was several years older, an incident occurred in the kitchen of her home while defendant was visiting. V. and defendant were the only people in the kitchen. Defendant started talking about his sex life with her aunt E. The conversation made her feel uncomfortable. The topic had come up before. Defendant told V. that her aunt liked him to nibble on her ear and then defendant nibbled on V.'s ear. He told V. that her aunt was "really good" at sex. Defendant unzipped her jeans and rubbed her, first over and then under her panties, while continuing to tell her about his sex life. His hand went

4

between the lips of her vagina. After three minutes of masturbating her, they could hear V.'s sister coming out of her room because the door made a lot of noise. Defendant took his hand out and went to the sink and pretended to wash his hands. When her sister walked in, V. had pulled her t-shirt over her pants. V. did not tell her sister what had happened on this occasion.

On Christmas Eve 2010, when V. was 15 years old, V.'s father, siblings, and she spent the night at defendant's apartment. V.'s mother was in Mexico. At about midnight, defendant came into the bedroom where V.'s sister, her cousin D., and she had gone to bed. Her sister and her cousin D. were asleep in one bed and she was alone in a second bed. Defendant sat next to her, he put his hand underneath the covers, and he unzipped her jeans. V. was wearing jeans because she was trying to "make it harder for him to get down there." Defendant started rubbing over her panties. At trial, V. was unsure whether defendant had touched her over or under her panties on this occasion. After about three minutes, V. got up and went into the living room where her father was asleep. V. sat on the sofa and stayed awake all night but she did not wake up her father. Defendant did not follow her into the living room.

At some point, V. asked her cousin D. if defendant had hit her or been physically abusive but she did not ask her cousin if defendant had touched her in a sexual way. V. danced around the subject and her cousin indicated that nothing had happened.

When V. was 16 years old, she told her friend D. about what was going on with defendant, her uncle. Her friend D. was the very first person she told. The conversation took place at school. V. appeared scared and sad to D.; V. began tearing up. V. told D. that she had never told anybody else that she had been sexually assaulted. Her friend D. told V. to tell a grownup. D. told V. to say something because V.'s uncle might be doing that to his own kids. V. did not act on this advice because she wanted "no drama, no big problems."

5

In December 2011, her male Spanish teacher pulled V. out of class because she was doing poorly in school and he was trying to find out what was happening. When V. said she did not want to talk about it, her teacher took her to a female school advisor. Her advisor started asking questions about possible problems and, when the advisor asked about sexual molestation, V. started crying. Her advisor was the first adult whom V. told about defendant's conduct. The police were called and V. spoke to a male officer at school.

On December 11, 2011, Sergeant Jorge Gutierrez, a San Jose police officer, spoke with V. and took a preliminary report. They spoke for about 30 to 45 minutes. At trial, V. explained that she did not feel comfortable telling the officer that defendant had used his fingers to penetrate her vagina before she was 13. Instead, she told him that defendant started putting his fingers in her vagina when she was 13 years old. During his testimony, Sergeant Jorge Gutierrez indicated that V. did not want to provide a lot of information to him and she was holding back.

V. was later interviewed by a female officer, Detective Angel Mina, who was assigned to the sexual assault unit and the investigating officer in this case. V. testified that she was speaking the truth when she told Detective Mina that defendant touched her approximately five to 10 times. At trial, V. confirmed that incidents had occurred when she was about nine or 10 years old. The incidents all involved defendant rubbing her vagina. They usually happened at night at defendant's apartment and involved defendant touching her vagina, usually under her clothes. He sometimes penetrated her vagina with his fingers. If someone came in, defendant acted like everything was normal.

V. was embarrassed and wanted to keep what happened a secret. She thought about yelling at defendant to stop but she "always chickened out." She was afraid of what would happen to the families and their relationships.

6

V. agreed to help the police by making a recorded telephone call to defendant. She was nervous and scared. The police instructed her to act normal and provided a list of questions. She used her mother's phone to call defendant and he answered.

The jury heard the recorded telephone call between V. and defendant. The call lasted about 10 to 15 minutes. When V. asked defendant why he had put his fingers in her and touched her, defendant indicated he was playing but he also said that he was sorry. In response to V.'s questions, he confirmed that she had not done anything to give him the idea that she wanted to be touched like that. When V. asked whether he thought she liked it when he put his finger inside her, defendant indicated that she had said three or four times that it felt good. When V. protested that she never said that, defendant said he did not remember. V. asked defendant if he could promise never to touch her or put his fingers inside her again. Defendant replied, "No problem." When she told him she did not like it and she was feeling scared, defendant told her thanks for letting him know. She indicated that she did not like it when she was "really young, like eight years old . . . ." Defendant indicated that he was "really, really sorry . . . ." During the conversation, defendant indicated that he thought, when he was touching her, it made her happy. Defendant said he would divorce his wife and he wanted to marry V. when she turned 19 years old. V. testified at trial that she had never told defendant that she enjoyed the touching.

V.'s family and the defendant's family were no longer close. The families do not speak to or visit each other.

In December 2011, Detective Isaac Miramontes, another San Jose police officer assigned to the sexual assault investigation unit, assisted Detective Mina in conducting a recorded interview of defendant. Detective Miramontes was certified by the San Jose Police Department as a bilingual speaker of English and Spanish. The recorded interview was played for the jury.

During the interview, defendant eventually admitted inappropriate touching. Defendant acknowledged a kitchen incident involving touching but he denied touching V.'s vagina. He described putting his hand on her pants and rubbing his hand up and down. Defendant eventually admitted his hand went inside V.'s pants but he denied putting his fingers on or inside her vagina. Defendant ultimately admitted touching V.'s pubic hair but he denied going "inside."

Defendant admitted to the officers that another incident had occurred about three years earlier. Defendant said he had rubbed V.'s leg with his fingers. He said that he knew what he did was wrong.

Defendant finally admitted touching V. when she was between the ages of eight to 10 years. Defendant said he rubbed V.'s leg and then went inside her pants but he claimed he did not go under her panties or "inside."

Detective Mina suggested that defendant write apology letters to V. and to his wife, which he did.

Carl Lewis, whom the court recognized as an expert in the area of CSAAS, testified. At the outset, Lewis clarified that that the syndrome was not a diagnosis of child abuse and he was not aware of the facts of this individual case. He described the five categories of CSAAS: secrecy, helplessness, entrapment and accommodation, delayed, conflicted, and unconvincing disclosure, and retraction.

The first category of secrecy relates to "the fact that the abuse of the child occurs almost exclusively or entirely when the offender is alone or somehow isolated with the child." An offender often goes to some length to create an atmosphere of secrecy, which sends a message to the child that there must be something bad or wrong about the behavior. This sense of secrecy causes a child to believe that keeping the information secret is very important. The secrecy category shows why mental health professionals

8

should not necessarily disbelieve a claim of child sexual abuse because the abuse was not disclosed earlier.

The second category of helplessness recognizes that children rely on adults and are helpless in varying degrees, depending on their age, maturity, and sophistication. As a result of this sense of helplessness, a child's process of disclosing sexual abuse may be tentative rather than "a onetime sit-down, tell everything event." It is more common for a child to disclose a little bit of information and gauge the reaction before divulging more. If an attempted disclosure is disregarded and more abuse occurs, a child's sense of helplessness may be reinforced.

The third category of entrapment and accommodation relates to sexually abused children finding a way to put up with that negative aspect of their lives. They accommodate in different ways to the sense of being trapped in an abusive situation. Sometimes children's behavior, appearance, or school performance changes. Some children may engage in substance abuse or self-harm, become promiscuous or rebellious, or even exploit the secret of the abuse against the offender. The most common accommodation by children, however, is to try to act as if nothing is wrong and maintain their daily lives. A child might deny anything is wrong if the child is not ready to tell.

The fourth category is delayed, conflicted, or unconvincing disclosure. Delayed disclosure describes the fact that most often children delay revealing abuse. The reasons for delay may relate to the child's relationship with the offender, the child's understanding of the relationship between the offender and a non-offending caretaker, or the child's fear. The mere fact of delay makes the child seem unbelievable to many people and might prompt a response like, " 'Well, if that had really been happening, you would have said something earlier.' " The conflicted aspect describes "the fact that a child is often going through an internal conflict, weighing the pros and cons of disclosure." Sexually abused children may disclose different little bits of information at different points.

9

Unconvincing disclosure refers to the timing and manner of disclosure that makes the child less believable. For example, a child may blurt out an accusation when the child is being punished or in the midst of a family conflict.

Lewis made clear that CSAAS is not a litmus test in an individual case.

## II

### *Discussion*

A. *Testimony Regarding Child Sexual Abuse Accommodation Syndrome*

1. *Background*

In a motion in limine, defendant argued that, if the court were to allow CSAAS evidence, the court should limit the evidence to testimony that is relevant to "a 'myth' that is identified and articulated by the government in light of the testimony received at the point in the trial that the CSAAS evidence is proffered."[4]

In an in limine motion, the prosecution indicated that it was planning to introduce CSAAS evidence "to dispel the misconceptions regarding accommodation, secrecy, helplessness, and delayed disclosure." The prosecution stated: "The evidence in this case will show that the victims [sic] did not resist the defendant or call out for help from other people in the house. [The victim] waited eight years to disclose the fact that she had been molested. Furthermore, while [the victim] was consistent that she was molested, she has been inconsistent as to the number of times that it happened and whether there was penetration or not. CSAAS evidence is necessary in this case to educate the jury that such acts of accommodation, helplessness, secrecy and delayed disclosure are not unusual in children who have been sexually abused and to dispel any misconceptions that

---

[4]     Defendant also sought to exclude Lewis's testimony regarding CSAAS on the grounds that the evidence did not meet the *Kelly-Frye* test (see *People v. Kelly* (1976) 17 Cal.3d 24; *Frye v. United States* (D.C. Cir. 1923) 293 F. 1013; see also *People v. Leahy* (1994) 8 Cal.4th 587, 593-604) and it had no probative value and was highly prejudicial. The trial court's rejection of these objections is not challenged as error on appeal.

just because the victim did not resist more strenuously, or report the incident immediately she must not have been molested."

The trial court ruled that CSAAS evidence was admissible. It explained that it was clear that the defense would attack the alleged victim's credibility. It recognized that the People wished to present CSAAS evidence to dispel misconceptions regarding delayed disclosure, helplessness, secrecy, and accommodation. It ruled that Lewis would be allowed to testify with respect to those misconceptions.

2. *Myths or Misconceptions Addressed by CSAAS*

Defendant asserts that the trial court erred because it failed to require the prosecution to demonstrate that myths or misconceptions concerning the behavior of child sexual abuse victims existed among the jurors trying his case. He asserts that the prosecution failed to "offer any evidence to show that people need to be 'educated' in this regard, or that people generally would harbor misconceptions in this area." He also complains that the prosecution's expert witness, Carl Lewis, "did not purport to have made a study of people's misconceptions, and he did not offer any opinions as to the existence or prevalence of such misconceptions." He maintains that CSAAS evidence is not admissible unless "such myths or misconceptions are shown to exist." Defendant suggests that, in ruling on the motion, the trial court failed to first find that present-day jurors must be disabused of any myth or misconception.

Defendant waived these objections to the admission of Lewis's CSAAS testimony by failing to raise them below. (Evid. Code, § 353.) In any case, they are without merit.

In determining the credibility of a witness, a jury is entitled to consider "any matter that has any tendency in reason to prove or disprove the truthfulness of [the witness's] testimony at the hearing . . . ." (Evid. Code, § 780.) Prior inconsistent statements and delayed reporting of an offense may bear on a complaining witness's credibility. (See Evid. Code, § 760, subd. (h) [witness's prior inconsistent statement];

11

*People v. Wrigley* (1963) 69 Cal.2d 149, 160 [defense counsel permitted to argue that delay in reporting the offense bore on child abuse victim's veracity]; see also *People v. Brown* (1994) 8 Cal.4th 746, 760 [observing that "[i]n cases involving an alleged robbery or larceny, for example, it is common for evidence to be admitted describing how and when the crime was reported by the victim, on the ground that such evidence is relevant to the determination of whether the offense occurred"].)

CSAAS evidence may also be relevant and admissible with respect to a complaining witness's credibility.  (See Evid. Code, §§ 210, 351, 801, subd. (a).)  Under Evidence Code section 801, subdivision (a), an expert may testify on subjects "sufficiently beyond common experience that the opinion of an expert would assist the trier of fact."  "Although inadmissible to prove that a molestation occurred, CSAAS testimony has been held admissible for the limited purpose of disabusing a jury of misconceptions it might hold about how a child reacts to a molestation.  ( *People v. McAlpin* (1991) 53 Cal.3d 1289, 1300-1301 . . . ; *People v. Bowker*, *supra*, 203 Cal.App.3d at p. 391.)"  (*People v. Patino* (1994) 26 Cal.App.4th 1737, 1744; see *People v. Housley* (1992) 6 Cal.App.4th 947, 957.)

"[I]t is the People's burden to identify the myth or misconception the evidence is designed to rebut."  (*People v. Bowker* (1988) 203 Cal.App.3d 385, 394.)  "[A]t a minimum the evidence must be targeted to a specific 'myth' or 'misconception' suggested by the evidence.  ([*People v. Bledsoe* (1984) 36 Cal.3d 236,] 247-248 . . . .)"  (*Id.* at pp. 393-394.)  "For instance, where a child delays a significant period of time before reporting an incident or pattern of abuse, an expert could testify that such delayed reporting is not inconsistent with the secretive environment often created by an abuser who occupies a position of trust."  (*Id.* at p. 394.)  "It is sufficient if the victim's credibility is placed in issue due to the paradoxical behavior, including a delay in reporting a molestation.  (*People v. Harlan* (1990) 222 Cal.App.3d 439, 449-450 . . . ;

12

*People v. Sanchez* (1989) 208 Cal.App.3d 721, 735-736 . . . .)"  (*People v. Patino*, *supra*, 26 Cal.App.4th at pp. 1744-1745.)  Here, the prosecution sufficiently identified the pertinent areas of misconception based on the evidence in this case.

In *People v. McAlpin* (1991) 53 Cal.3d 1289 (*McAlpin*), which involved a conviction of lewd and lascivious conduct (§ 288, subd. (a)), the California Supreme Court held that expert testimony regarding parental reluctance to report child molestation was admissible to bolster the parent's credibility.  (*Id*. at pp. 1298-1302.)  The court reasoned: "Most jurors, fortunately, have been spared the experience of being the parent of a sexually molested child.  Lacking that experience, jurors can rely only on their intuition or on relevant evidence introduced at trial.  It is reasonable to conclude that on the basis of their intuition alone many jurors would tend to believe that a parent of a molested child, naturally concerned for the welfare of the child and of other children, would promptly report the crime to the authorities, just as a parent would be likely to do if the child complained of someone who had beaten him or stolen his pocket money.  Yet here the prosecution had evidence to the contrary—the expert opinion of Officer Miller that in fact it is not at all unusual for a parent to refrain from reporting a known child molestation, for a number of reasons.  Such evidence would therefore 'assist the trier of fact' (Evid. Code, § 801, subd. (a)) by giving the jurors information they needed to objectively evaluate [the mother's] credibility.  And the evidence was clearly relevant (*id*., § 210) because it tended to rehabilitate the testimony of [the mother] as a corroborating witness.  It follows that the trial court did not abuse its discretion in admitting the challenged testimony."  (*Id*. at p. 1302, fns. omitted.)

In *McAlpin*, the California Supreme Court analogized the expert testimony on parental reactions to a child's report of sexual abuse to the "expert testimony on common stress reactions of children who have been sexually molested ('child sexual abuse accommodation syndrome'), which also may include the child's failure to report, or delay

13

in reporting, the abuse." (*Id*. at p. 1300.) The court recognized that "expert testimony on the common reactions of child molestation victims" "is admissible to rehabilitate such witness's credibility when the defendant suggests that the child's conduct after the incident-e.g., a delay in reporting-is inconsistent with his or her testimony claiming molestation. [Citations.]" (*Id*. at pp. 1300-1301, fn. omitted.) It stated: " 'Such expert testimony is needed to disabuse jurors of commonly held misconceptions about child sexual abuse, and to explain the emotional antecedents of abused children's seemingly self-impeaching behavior. . . .' [Citation.]" (*Id*. at p. 1301.)

This reasoning applies to the admission of CSAAS evidence in this case. Although trained mental health professionals may be more aware of the seemingly counterintuitive behavior of child abuse victims today than in the past, lay jurors may well lack knowledge of the not uncommon reactions of child sexual abuse victims. Jurors unfamiliar with CSAAS may tend to believe that a molested child would promptly report sexual abuse to someone, would appear traumatized, and would not keep the abuse secret for years.[5] As can be seen from the CSAAS evidence, such assumptions may not be true for many child victims.

Moreover, as the court recognized in *McAlpin*: " 'The jury need not be wholly ignorant of the subject matter of the opinion in order to justify its admission; if that were the test, little expert opinion testimony would ever be heard. Instead, the statute declares that even if the jury has some knowledge of the matter, expert opinion may be admitted whenever it would "assist" the jury. It will be excluded only when it would add nothing at all to the jury's common fund of information, i.e., when "the subject of inquiry is one of such common knowledge that men of ordinary education could reach a conclusion as

---

5       At trial, V.'s Aunt E. acknowledged that she believed that if a child is being molested, the child would tell someone right away that it was happening. She believed that such a child would act sad and she would be able to tell that it was happening.

14

intelligently as the witness." ' [Citation.] (*People v. McDonald* (1984) 37 Cal.3d 351, 367 . . . .)" (*People v. McAlpin*, *supra*, 53 Cal.3d at pp. 1299-1300.) Defendant has not shown that the court should have excluded the CSAAS testimony because it could be expected to "add nothing at all" to the jury's knowledge.

"[T]he decision of a trial court to admit expert testimony 'will not be disturbed on appeal unless a manifest abuse of discretion is shown.' [Citations.]" (*Id*. at p. 1299.) We find that the trial court acted within its discretion in admitting the CSAAS evidence.

Insofar as defendant is now charging that Lewis improperly commented on V.'s credibility, this specific objection was also waived. (Evid. Code, § 353.) Moreover, the claim is wholly without merit. He fails to point to any testimonial comment concerning V. In fact, Lewis indicated that CSAAS was not diagnostic or proof of child sexual abuse and he did not know the facts of this case.

3. *CALCRIM No. 1193*

The trial court gave the jury the standard CALCRIM instruction (CALCRIM No. 1193) regarding consideration of CSAAS evidence: "You've heard the testimony from Carl Lewis regarding child sexual abuse accommodation syndrome. Mr. Lewis's testimony about child sexual abuse accommodation syndrome is not evidence that the defendant committed any of the crimes charged against him. [¶] You may consider this evidence only in deciding whether or not [the victim's] conduct was not inconsistent with the conduct of someone who has been molested and in evaluating the believability of her testimony."

Defendant argues that the CSAAS instruction singled out V.'s testimony for special consideration and excepted her from the standard instruction regarding witness credibility (CALCRIM No. 226) that applied to other witnesses. He claims: "As to her, but as to no other witness, the jurors were authorized to utilize the testimony of another witness - Mr. Lewis – in making their decision. If they elected to rely on Mr. Lewis'

15

testimony instead of their own common sense, the instruction authorized them to do so. If they harbored reasonable doubt based on [V.'s] inconsistent reports, for instance, the instruction authorized them to rely on Mr. Lewis' testimony to resolve that reasonable doubt."

In attacking the CSAAS instruction, defendant ignores a cardinal principle: " ' "[T]he correctness of jury instructions is to be determined from the entire charge of the court, not from a consideration of parts of an instruction or from a particular instruction." [Citations.]' (*People v. Carrington* (2009) 47 Cal.4th 145, 192 . . . .)" (*People v. Solomon* (2010) 49 Cal.4th 792, 822.) "[A] single instruction to a jury may not be judged in artificial isolation, but must be viewed in the context of the overall charge. *Boyd v. United States*, 271 U.S. 104, 107, 46 S.Ct. 442, 443, 70 L.Ed. 857 (1926)." (*Cupp v. Naughten* (1973) 414 U.S. 141, 146-147 [94 S.Ct. 396].)

As a part of its overall charge, the trial court admonished the jury to "[p]ay careful attention to all of these instructions and consider them together." The jurors were told that they "must decide whether a fact in issue has been proved based on all the evidence."

In addition to the CSAAS instruction, the trial court gave CALCRIM No. 226, instructing in part: "You alone must judge the credibility or believability of the witnesses. In deciding whether testimony is true and accurate, use your common sense and experience." It explained: "In evaluating a witness's testimony, you may consider anything that reasonably tends to prove or disprove the truth or accuracy of that testimony." The court told the jury: "Do not automatically reject testimony just because of inconsistencies or conflicts. Consider whether the differences are important or not."

The trial court also gave CALCRIM No. 332, the standard instruction regarding expert witness testimony. It instructed the jurors that they were "not required to accept [an expert's opinion] as true or correct." It told them: "You may disregard any opinion that you find unbelievable, unreasonable, or unsupported by the evidence."

16

The jury received full instructions from the trial court on the presumption of innocence and the requirement that the People prove defendant's guilt beyond a reasonable doubt. The court told the jury: "In deciding whether the People have proved their case beyond a reasonable doubt, you must impartially compare and consider all the evidence that was received throughout the entire trial."

As can be seen, the CSAAS instruction, considered individually and in the context of the other instructions, did *not* tell the jury to believe V. if her conduct was consistent with Lewis's CSAAS testimony. To the contrary, the instruction informed the jury that the testimony is "not evidence that the defendant committed any of the crimes charged against him." In other words, it is improper to use CSAAS evidence as substantive proof of guilt.

CALCRIM No. 1193 limits use of CSAAS testimony to evaluation of the credibility of the complaining witness and its language must be read in context. The instruction allows a jury to consider CSAAS evidence in deciding whether V.'s conduct was "not inconsistent with conduct of someone who has been molested . . . ." Evaluation of the credibility of a witness claiming to have been sexually abused as a child may involve consideration of relevant evidence of the not uncommon reactions of child sexual abuse victims because otherwise fallacious assumptions about the general behavior of such victims might lead jurors to automatically dismiss a complaining witness's testimony.

Defendant misconstrues CALCRIM No. 1193, which is in essence a limiting instruction. The instructions read together inform jurors that they may consider CSAAS evidence together with other relevant evidence in evaluating the believability of a complaining witness. CALCRIM No. 1193 seeks to ensure that CSAAS testimony will

17

be used for only that limited purpose but not for the improper purpose of directly inferring guilt from the behavior of a complaining witness consistent with CSAAS.[6]

The instruction pursuant to CALCRIM No. 1193 did not treat V.'s credibility more favorably than other witnesses, except her testimony from the application of CALCRIM No. 226, or put the court's imprimatur upon Lewis's testimony. That instruction did not invite the jurors to disregard their common sense when evaluating V.'s credibility if they accepted Lewis's general CSAAS testimony. As a whole, the instructions informed the jurors that they were the judges of witness credibility and should consider all evidence relevant to credibility.

Moreover, Lewis's testimony made clear that CSAAS was not a diagnosis or a litmus test in any particular case and he did not know the facts of this case. He expressed no opinion regarding whether V. was telling the truth. His testimony did not invade the province of the jury as suggested by defendant. Defense counsel was free to cross-examine Lewis regarding the limitations of CSAAS with respect to a particular instance of alleged sexual abuse. Under the CSAAS instruction and the other instructions given, the jurors remained the fact-finders and were responsible for assessing the credibility of all witnesses, including Lewis, V. and defendant.

*People v. Robbie* (2001) 92 Cal.App.4th 1075 (*Robbie*), which defendant cites, is inapt. In that case, the appellate court concluded that the trial court committed reversible error by admitting expert testimony regarding the profile of a rapist. (*Id*. at 1088; see *id*. at pp. 1084 ["Profile evidence is generally inadmissible to prove guilt"], 1086 ["Profile

---

[6]    Insofar as defendant is complaining that the CSAAS instruction did not include language contained in CALJIC No. 10.64, any claim of error is waived. "A party may not complain on appeal that an instruction correct in law and responsive to the evidence was too general or incomplete unless the party has requested appropriate clarifying or amplifying language. (*People v. Andrews* (1989) 49 Cal.3d 200, 218 . . . .)" (*People v. Lang* (1989) 49 Cal.3d 991, 1024.)

18

evidence is unfairly relied upon to affirmatively prove a defendant's guilt based on his match with the profile"].) No issue of profile evidence arose in this case. Under CALCRIM 1193, a jury is effectively barred from using CSAAS evidence as "profile evidence" of a sexually abused child.

"In assessing a claim of instructional error or ambiguity, we consider the instructions as a whole to determine whether there is a reasonable likelihood the jury was misled. (E.g., *People v. Ervine* (2009) 47 Cal.4th 745, 804 . . . ; *People v. Smithey* (1999) 20 Cal.4th 936, 963-964 . . . (*Smithey*); see *Estelle v. McGuire* (1991) 502 U.S. 62, 72 & fn. 4, 112 S.Ct. 475, 116 L.Ed.2d 385.)" (*People v. Tate* (2010) 49 Cal.4th 635, 696.) In this case, we discern no instructional error with respect to the purpose for which the jury could consider the CSAAS evidence. Moreover, based upon our review of the record, we find no reasonable likelihood that the jury misunderstood or misapplied the CSAAS instruction.

4. *Constitutional Rights*

Defendant also challenges the admission of Lewis's CSAAS testimony in light of CALCRIM No. 1193 on constitutional grounds. He asserts that the court's evidentiary ruling interfered with his constitutional right to present a defense. He also claims that the testimony and the instruction together infringed upon his rights to confront adverse witnesses and to have the jury determine witness credibility.

"Few rights are more fundamental than that of an accused to present witnesses in his own defense. [Citations.] In the exercise of this right, the accused, as is required of the State, must comply with established rules of procedure and evidence designed to assure both fairness and reliability in the ascertainment of guilt and innocence." (*Chambers v. Mississippi* (1973) 410 U.S. 284, 302 [93 S.Ct. 1038]; see *People v. Abilez* (2007) 41 Cal.4th 472, 503 [general rule is that application of the ordinary rules of evidence under state law do not violate a criminal defendant's federal constitutional right

19

to present a defense].) Defendant has failed to show that the admission of relevant CSAAS evidence or the CSAAS instruction interfered with his right to present a defense. Defendant is not complaining that the court excluded crucial defense evidence. He did not claim to have an opposing expert whom the court prevented from testifying.

Neither has defendant shown that his right to cross-examine and confront Lewis or V. was denied or circumscribed in any way. Moreover, as indicated, the challenged CSAAS instruction did not withdraw evaluation of witness V.'s credibility from the jury.

Defendant has not demonstrated the trial court's ruling admitting CSAAS evidence or its CSAAS instruction, separately or together, violated any of defendant's constitutional rights.

B. *CALCRIM No. 370*

Defendant asserts that the trial court's motive instruction constituted reversible error "because it was at odds with the intent element" of the charged violations of section 288, subdivision (c)(1) (counts four and five).

Pursuant to CALCRIM No. 370, the court instructed: "The People are not required to prove that the defendant had a motive to commit any of the crimes charged. [¶] In reaching your verdict, you may, however, consider whether the defendant had a motive. Having a motive may be a factor tending to show that the defendant is guilty. Not having a motive may be a factor tending to show the defendant is not guilty." The Bench Notes to CALCRIM No. 370 warns: "**Do not** give this instruction if motive is an element of the crime charged. (See, e.g., CALCRIM No. 1122, *Annoying or Molesting a Child.*)"

In *People v. Maurer* (1995) 32 Cal.App.4th 1121 (*Maurer*), an appellate court reversed two convictions of misdemeanor child annoyance (§ 647.6) because the motive instruction conflicted with the instruction on the requisite mental state of those offenses. (*Id*. at p. 1125.) An element of misdemeanor child annoyance is that defendant's conduct is " ' "motivated by an unnatural or abnormal sexual interest" ' in the victim (*People v.*

20

*Maurer* (1995) 32 Cal.App.4th 1121, 1127 . . . , italics omitted, quoting *In re Gladys R.* (1970) 1 Cal.3d 855, 867-868 . . . )." (*People v. Lopez* (1998) 19 Cal.4th 282, 289; see CALCRIM No. 1122.)

In *Maurer*, *supra*, 32 Cal.App.4th 1121, one instruction told the jurors that, to convict the defendant of the charges of misdemeanor child annoyance (§ 647.6), the People must prove that defendant's acts or conduct were motivated by an unnatural or abnormal sexual interest in the alleged victim. (*Id.* at pp. 1125, 1127.) "Another instruction told the jurors that '[m]otive is not an element of the crime charged and need not be shown.' " (*Id.* at p. 1127.) The court concluded that "the trial court erred by not excluding the section 647.6 offenses from the motive instruction . . . ." (*Ibid.*)

Defendant now argues that, "[b]y a parity of reasoning" with *Maurer*, the trial court erred by giving a motive instruction with regard to the section 288 offenses because section 288 offenses requires proof that the person charged had the specific intent "of arousing, appealing to, or gratifying the lust, passions, or sexual desires of that person or the child" (§ 288, subd. (a)). This case and *Maurer* are not analogous.

First, in this case, the motive instruction and the instruction regarding the elements of a violation of section 288, subdivision (c), were not squarely conflicting as in *Maurer*. A conviction of lewd and lascivious conduct does not require proof that the conduct was motivated by an unnatural or abnormal sexual interest in the victim. Any touching of a child is a lewd and lascivious act, "even if the touching is outwardly innocuous and inoffensive, if it is accompanied by the *intent* to arouse or gratify the sexual desires of either the perpetrator or the victim. (*People v. Martinez* (1995) 11 Cal.4th 434, 450-452 . . . .)" (*People v. Lopez, supra*, 19 Cal.4th at p. 289.) "Section 647.6, subdivision (a), on the other hand, requires an act objectively and unhesitatingly viewed as irritating or disturbing, prompted by an abnormal sexual interest in children." (*Id.* at p. 290, italics omitted.)

21

Second, motive and intent are not synonyms.  (See *People v. Hillhouse* (2002) 27 Cal.4th 469, 504.)  In the case of sexual offenses, a defendant's "motive" and "intent" may be closely related but the terms are still distinct.

The Supreme Court has stated:  "Motive describes the reason a person chooses to commit a crime.  The reason, however, is different than a required mental state such as intent or malice."  (*Ibid*.)  That statement is consistent with dictionary definitions.  The word "motive" has been defined in ordinary usage as "something (as a need or desire) that causes a person to act" (Webster's Ninth New Collegiate Dict. (1990 ed.) p. 774) or "a reason for doing something, esp. one that is hidden or not obvious . . . ."  (New Oxford American Dict. (3rd ed. 2011) <http://www.oxfordreference.com/view/10.1093/acref/9780195392883.001.0001/m_en_us1269426?rskey=dxN3Vt&result=5> [as of Oct. 21, 2013].)  Thus, for example, the motive in a case of child sexual abuse might be a person's sexual attraction to children.  In contrast, "intent" is defined as "purpose" or "state of mind with which an act is done" (Webster's Ninth New Collegiate Dict. (1990 ed.) p. 629).  Here, the court instructed the jury regarding the requisite specific intent, namely "the intent of arousing, appealing to, or gratifying the lust, passions, or sexual desires of himself or the child."

In *People v. Guerra* (2006) 37 Cal.4th 1067, disapproved on a different ground in *People v. Rundle* (2008) 43 Cal.4th 76, 151, the jury found the defendant guilty of first degree murder and it found true the special-circumstance allegation that defendant murdered the victim while engaged in the attempted commission of rape.  (*Id*. at p. 1078.)  On appeal, one of the defendant's arguments was that "the motive instruction relieved the prosecution of its burden of proving beyond a reasonable doubt defendant possessed the requisite intent to rape when he killed [the victim]."  (*Id*. at p. 1135.)  The defendant asserted that "motive and intent were indistinguishable" in that case.  (*Ibid*.)

The California Supreme Court noted in *Guerra* that "although the intent to commit rape was an element of the offense, motive was not." (*Ibid*.) It rejected the defendant's contention, stating: "[T]he trial court instructed the jury that to find the rape-murder special-circumstance, it must find the 'murder was committed in order to carry out or to advance the commission of the crime of attempted rape' and the special-circumstance 'is not established if the attempted rape was merely incidental to the murder.' Consequently, the instructions as a whole did not refer to motive and intent interchangeably. We find no reasonable likelihood that the jury understood those terms to be synonymous. (*People v. Cash* (2002) 28 Cal.4th 703, 739 . . . .)" (*Ibid*.)

Likewise in this case, the court's instructions did not use the words "motive" and "intent" interchangeably. We find no reasonable likelihood that the jury understood those terms to be synonymous.

### DISPOSITION

The judgment is affirmed.

_____

ELIA, Acting P. J.

WE CONCUR:

_____

MIHARA, J.

_____

GROVER, J.